UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED
MAY 15 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ESTATE OF RONALD E. JOHNSON, and through its Personal Representative, Lynette K. Johnson; and LYNETTE K. JOHNSON, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>DOUGLAS WEBER; TROY PRONTO; DARIN YOUNG; CRYSTAL VAN VOOREN; DENNY KAEMINGK; LAURIE FEILER; TIMOTHY A. REISCH; SOUTH DAKOTA DEPARTMENT OF CORRECTIONS, STATE OF SOUTH DAKOTA; and JOHN DOES 1-20,<br><br>Defendants. | CIV 12-4084<br><br><br><br><br>MEMORANDUM OPINION AND ORDER |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

   This case arises from the death of Ronald E. Johnson, a correctional officer who worked for the South Dakota Department of Corrections at the South Dakota State Penitentiary (SDSP) for years. On April 12, 2011, Ronald Johnson was at work when he was brutally murdered by inmates Rodney Berget and Eric Robert. Plaintiffs Lynette Johnson and the Estate of Ronald Johnson (Plaintiffs) filed a complaint in state court pleading five state law claims and one federal constitutional claim under 42 U.S.C. § 1983 alleging that Defendants created the danger that resulted in the death of Ronald Johnson. Defendants removed the case to federal court pursuant to 28 U.S.C. § 1441(a). This Court has jurisdiction under 28 U.S.C. § 1331 because the complaint includes a

federal constitutional law claim. The Court may exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

Defendants filed a motion for summary judgment arguing that they are entitled to qualified immunity because the evidence does not meet the high standard required to prove a state-created danger claim. The brutal murder of guard Ronald Johnson by Berget and Robert shocks everyone's conscience. That, however, is not the test for whether there was a constitutional violation by Warden Weber and other Defendant South Dakota State Penitentiary employees. Likewise, this is not a question of whether Warden Weber and others were negligent or grossly negligent, as those levels of proof do not meet the high burden necessary for finding a constitutional violation. Instead, the question is primarily whether the actions and inactions of Warden Weber or any of the other prison employee Defendants shock the conscience. The actions of Warden Weber and the other employees do not shock the conscience, and for that and the following reasons Defendants are entitled to summary judgment on the constitutional violation claim.[1] The remaining five state law claims will be remanded for further proceedings to the South Dakota trial court from which they were removed.

## BACKGROUND

In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The facts below are presented in the light most favorable to the Plaintiffs in this case.

As part of an escape attempt, inmates Eric Robert and Rodney Berget murdered Ronald Johnson on April 12, 2011, in the Prison Industries building (PI building) at the SDSP in Sioux Falls,

---

[1] The Court will deny Defendants' motion to strike the affidavit of Chester Buie and the interview of Timothy Henry, doc. 60, and the Court will consider Buie and Henry's affidavits. In addition, the Court will grant Plaintiffs' motion for leave to supplement the materials in response to the motion for summary judgment, doc. 67, and the Court will consider admissible information that is based on personal knowledge in the affidavits of Andrew Hanson and David Tolley.

near Johnson's post that day.[2] Johnson was a senior correctional officer and was staffing the PI building in place of Officer Craig Baumberger, who was out that day. Johnson and eight shop supervisors were assigned to the PI building.

The Jameson Annex is the only South Dakota Department of Corrections (DOC) facility designated to house maximum custody inmates. On April 12, 2011, the SDSP housed mostly medium custody inmates. On that day, Berget and Robert were maximum custody inmates that, pursuant to DOC policy, were to be housed in the Jameson Annex absent a discretionary "administrative decision" or other similar process that allows them to be housed elsewhere.[3] The DOC's classification policy provides, in part, that, in the Warden's discretion, an inmate may be housed in a facility other than where his custody level suggests. Such a placement requires approval of the deputy warden or an associate warden, the warden, and the Classification and Transfer manager for the DOC. The Defendants moved Berget and Robert out of the Jameson Annex and into West Hall at the SDSP, a facility with lower levels of custody and supervision. Berget was moved to West Hall in June of 2004. Robert was moved there in June of 2009. The "administrative decision" paperwork process was not followed and Defendants did not properly document the transfers or the reasons for transferring Berget and Robert out of the Jameson Annex. Berget resided outside of the Jameson Annex for half of 2004 without any written authorization. Warden Weber testified that DOC policy forbids making deals with inmates, and that he was obligated to comply with DOC policy. Although Warden Weber denies it, the testimony of some other witnesses

---

[2]In 2011, two state or federal correctional officers were killed in the line of duty. Before Johnson's murder, the last time that a correctional officer was killed in the line of duty in South Dakota was on September 6, 1951, when a correctional officer was murdered by an inmate.

[3]In May, 2011, there were 677 inmates housed in general population at the SDSP. Of that number, 456 were incarcerated for a violent offense, and 203 had escape points counted on their classifications. There were 47 maximum custody inmates housed at the SDSP, outside of the Jameson Annex. In a subsequent Technical Assistance Report requested by the DOC and submitted by the National Institute of Corrections on September 21, 2011, it was reported that there was sufficient vacant bed space at Jameson to absorb the maximum custody inmates that were being housed at the SDSP.

indicates that Warden Weber made deals to move Robert and Berget into West Hall in exchange for ending their hunger strikes.[4]

On April 12, 2011, both Berget and Robert were living in West Hall at the SDSP, although not in the same cell. According to DOC policy, inmates in the Jameson Annex are subject to direct correctional supervision while inmates in West Hall are not. Witnesses testified that Berget and Robert were not subject to direct correctional supervision while in West Hall.

The Defendants knew the violent criminal histories of Berget and Robert. Berget's criminal history includes a conviction for grand theft in 1977, when he was first incarcerated at the SDSP at the age of 15. His criminal history after 1977 included convictions for grand theft, burglary, escape, kidnapping, and attempted first degree murder. As of April 12, 2011, Berget was serving a life sentence for the attempted murder conviction, and a second life sentence for the kidnapping.[5] When Berget arrived at the SDSP on December 4, 2003, he was housed at the Jameson Annex until his transfer to West Hall in June of 2004. Berget's West Hall housing was continued by Acting Warden, Daryl Slykhuis, in February, 2005, and renewed again in December, 2005, without all of the required signatures on the form. Berget's placement in West Hall was reviewed and confirmed again in December of the following years, up to and including December, 2010. The proper paperwork was not always completed.

---

[4] Although the Court makes no credibility determination of who to believe on that point, the Court for purposes of this motion is required to take the view most favorable to the non-moving party. Since the Plaintiffs are the non-moving party on this motion, the Court for purposes of the motion must consider that hunger strike deals were made.

[5] These convictions resulted from Berget shooting his ex-girlfriend and her friend, then kidnapping a store clerk at gun point on June 2, 2003.

Robert was convicted of kidnapping in January, 2006.[6] He was sentenced in Meade County to a term of 80 years in prison. He had no previous criminal history. Shortly after Robert arrived at the SDSP in January, 2006, he was housed in West Hall because he was not a maximum custody inmate. After his arrival, penitentiary officials learned that a woman in Brule County had been raped by Robert in 2002 or 2003, and she had obtained a protection order against Robert. She had been in a relationship with Robert and she did not report the rape at the time it occurred. At Robert's annual classification review on January 8, 2007, his recommended placement was at the SDSP. On September 5, 2007, after he was written up for tampering with a lock, Robert's placement was changed to Jameson and this was renewed in April of 2008 and 2009. He was moved back to West hall on June 24, 2009. That placement was continued by "administrative decision" in April, 2010.

Defendants knew about Berget and Robert's escape histories. In 1984, Berget escaped from the SDSP, for which he was prosecuted and convicted. In 1987, Berget escaped from the SDSP through an air handling unit, for which he was prosecuted and convicted. In 1988, Berget jumped out of a van during a transport. In June, 1991, Berget was disciplined because of his involvement in a proposed escape that was discovered before it was attempted involving some steel mesh over windows in the cell hall that had been cut. In 1994, Berget was disciplined for cutting security bars in the East Hall shower room. In December, 2003, Berget was involved in helping another inmate try to escape from the Lawrence County jail by lifting him over a wall. He was not charged with a crime, but the activity was scored by the DOC as an escape attempt in his classification reviews. Although some witnesses testified that Berget may have been involved with Robert in planning an escape in 2007, there is no evidence that any of the Defendants were aware of his possible involvement, and there are no documented escape attempts for Berget between December 4, 2003 and April 12, 2011. There is some evidence, however, that Berget might have been planning escape attempts. Former inmate Tim Henry indicated that in late 2009 he reported to a DOC employee that Berget and Robert were planning to escape from the penitentiary. Berget's cell was searched in

---

[6]On July 24, 2005, Robert impersonated a law enforcement officer and pulled over a woman on a road near Black Hawk, South Dakota. He forced her into the trunk of her vehicle. The woman called authorities with her cell phone and was rescued.

August, 2010, and officers discovered a box cutter razor blade, an exacto knife razor blade, and drill bits. He was cited for possessing unauthorized articles, and he was placed in disciplinary segregation. Except for what happened on April 12, 2011, Berget's escapes or attempts did not involve violence.

Robert was disciplined for attempted escape in June, 2007. A confidential informant told authorities that Robert cut part of a lock in the West Hall shower room at the SDSP. At the time, Robert was working as an orderly in the shower room. As stated earlier, there is some testimony indicating that Berget may have been involved. Robert was given 90 days in disciplinary segregation in the Jameson Annex, and he continued to reside in Jameson until 2009 when he was moved back to West Hall. Robert had no other escape attempts and no escapes in his institutional or criminal history.

As for job assignments, Berget regularly held orderly positions. There are no documented problems with Berget's job assignments before April 12, 2011. Former correctional officer Chester Buie opined in his affidavit that Berget used his jobs to give him the ability to have periods of time where he could move about the penitentiary, unobserved, possibly planning escapes.[7] Berget's job on April 12 was trash recycling orderly, a job he started on March 18, 2011. In that position, Berget would leave and return to West Hall multiple times per day.

Robert was working as a laundry cart pusher on April 12, 2011. He was assigned his job as a laundry cart pusher on December 14, 2009. This involved making round trips each day with a laundry cart between West Hall and the laundry, located in the PI building, which is outside and across the yard, but within the secure perimeter of the SDSP. The round trip typically occurred six times each weekday morning and 10-12 times each weekday afternoon. Correctional officer, Brad Woodward, testified that Robert wanted to work in the shop in the PI Building, but he was not allowed to work there because he had seven escape points for his attempted escape in June, 2007

---

[7]Buie went to work as a correctional officer at the SDSP in 1980 and continued to be employed there until his retirement in January of 2011.

when he cut a lock in the shower room. An inmate with seven escape points is not allowed to work in one of the Prison Industries' shops.

According to his affidavit, in late summer or early fall of 2010, Buie heard that Berget and Robert's names came up all the time during senior staff meetings with Warden Weber. On separate occasions, he asked Warden Weber and unit manager Brad Woodward when they were going to lock up Berget and Robert. He got no response. Officer Buie kept an eye on Berget and Robert and noticed that they were routinely together by September of 2010.

On April 12, 2011, Berget and Robert left West Hall for the PI building. The usual work day for inmates was from about 7:00 a.m. until 3:45 p.m, with a break for lunch and a break for a standing count. Dennis Donovan, the laundry supervisor, wrote in an informational report on April 18, 2011, that Robert was in and out of the laundry four or five times before 9:40 a.m. on April 12, 2011. Sometime after 10:00 a.m. Berget and Robert attacked Ronald Johnson. They assaulted him, took part of his uniform, wrapped his head in shrink wrap, and tried to cover his body with cardboard. Robert put on part of Johnson's uniform and Berget hid himself in a large box that Robert then pushed on a hand cart to the West Gate, a service entrance to the SDSP, where they were apprehended after a correctional officer refused to open the outside gate.

After the murder and escape attempt, Robert was charged with first degree murder, first degree felony murder, and simple assault, and was also arraigned on an information for being a habitual offender. He pleaded guilty to the charge of first degree murder and was sentenced to death. He was executed on October 15, 2012. Berget was charged with and pleaded guilty to first-degree murder and was sentenced to death. He remains incarcerated on death row.

## DISCUSSION

The doctrine of qualified immunity shields government officials from liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified

immunity is an immunity from suit rather than a mere defense to liability, which is effectively lost if a case is erroneously permitted to go to trial." *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (citations and internal quotations omitted). "Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (citation omitted).

The initial inquiry in the qualified immunity analysis is this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the facts alleged demonstrate a constitutional violation, the second inquiry "is to ask whether the right was clearly established"; that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02. Third, the Court must determine if, taking the facts in the light most favorable to the Plaintiff, "there are no genuine issues of material fact as to whether a reasonable official would have known that the alleged actions violated that right." *Foulks v. Cole County*, 991 F.2d 454, 456 (8th Cir. 1993).

The first question for this Court is whether the facts alleged by Plaintiffs demonstrate a constitutional violation. Plaintiffs' § 1983 claim is based on the substantive component of the Due Process Clause that protects individual liberty against certain government actions. Plaintiffs claim that Defendants' conduct deprived Ronald Johnson of substantive due process by affirmatively creating the danger that brought about his death. The Fourteenth Amendment states in part: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV; *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 194–95 (1989). The Supreme Court has noted, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney*, 489 U.S. at 195. Thus, "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may

be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196.

Generally, state actors are liable under the Due Process Clause only for their own acts and not for the violent acts of third parties, *see Fields v. Abbott*, 652 F.3d 886, 890 (8th Cir. 2011), but the Eighth Circuit has recognized two exceptions to this rule: (1) the state owes a duty to protect those in its custody; and (2) "the state owes a duty to protect individuals if it created the danger to which the individuals are subjected." *Id.* This second exception is called the state-created danger theory. *Id.* Plaintiffs' constitutional claim in this case rests on the danger creation theory. The state-created danger doctrine derives from the Supreme Court's decision in *DeShaney*. In that case, a four-year-old boy was repeatedly beaten by his father. 489 U.S. at 192–93. The county Department of Social Services (DSS) obtained a court order to place the boy in the temporary custody of a local hospital, but it returned him to his father's custody after deciding there was insufficient evidence of abuse. *Id.* at 192. Despite signs of continuing abuse when DSS would check on the boy each month, DSS failed to take any action to protect him. *Id.* at 192–93. Finally, the father beat the boy so severely that he suffered severe brain damage. *Id.* at 193.

The boy and his mother sued DSS and several of its employees under § 1983, alleging that they violated the boy's rights under the Due Process Clause by failing to protect him against a risk of which they knew or should have known. *Id.* The Supreme Court rejected the claim, stating, "[a]s a general matter, ... we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. The Court acknowledged that in limited contexts, such as "incarceration, institutionalization, or other similar restraint of personal liberty," a "special relationship" between the state and the individual imposes on the state an affirmative duty to protect, but found that such a relationship did not exist between the boy and the state because the harm occurred while the boy was in his father's custody and not while he was in the state's custody. *Id.* at 200–03.

The Supreme Court further explained that the state could not be held liable because it had not, by its actions, placed the boy in a more dangerous position:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

*Id.* at 201. Lower courts, including the Eighth Circuit, have relied on this language to recognize a "state-created danger" exception that creates a duty to protect against private violence in limited circumstances.

The Eighth Circuit has explained that to succeed on the state-created danger theory of substantive due process, Plaintiffs must prove: (1) that Ronald Johnson was a member of a limited, precisely definable group, (2) that the defendants' conduct put him at a significant risk of serious, immediate, and proximate harm, (3) that the risk was obvious or known to the defendants, (4) that the defendants acted recklessly in conscious disregard of the risk, and (5) that in total, the defendants' conduct shocks the conscience. *Fields,* 652 F.3d at 891 (internal quotations and citation omitted).

In many state-created danger cases, as in the Eighth Circuit's decision in *Fields*, the courts focus on whether the defendant's conduct shocks the conscience, and the cases demonstrate that the mental state required to violate a substantive right is a critical issue for all plaintiffs asserting a state-created danger claim. Whether conduct is conscious shocking is a question of law for the court. *See Terrell v. Larson,* 396 F.3d 975, 981 (8th Cir. 2005) (en banc) ("Because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury.").

In *Fields*, the Eighth Circuit held the state did not have a due process duty to protect a jailer from attack by two inmates. The Eighth Circuit assumed that the plaintiff could satisfy the first four elements of the state-created danger test, but found her claim failed because the evidence did not show the defendants engaged in conscience shocking, deliberately indifferent conduct. The Eighth Circuit in *Fields* discussed "the constitutional concept of conscience shocking:"

> "[T]he constitutional concept of conscience shocking duplicates no traditional category of common-law fault." *Lewis*, 523 U.S. at 848, 118 S.Ct. 1708. "[A]ctionable substantive due process claims involve a level of abuse of power so brutal and offensive that they do not comport with traditional ideas of fair play and decency." *Hart*, 432 F.3d at 806 (brackets, ellipses, and internal quotation marks omitted). Under the state-created-danger theory, negligence and gross negligence cannot support a § 1983 claim alleging a violation of substantive due process rights. *Id.* at 805. And "[p]roof of intent to harm is usually required, but in some cases, proof of deliberate indifference, an intermediate level of culpability, will satisfy this substantive due process threshold." *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005).
>
> The deliberate-indifference standard is employed only where actual deliberation is practicable. *Lewis*, 523 U.S. at 851–53, 118 S.Ct. 1708 (differentiating between substantive due process cases in which the deliberate-indifference standard applies because prison officials have the luxury of time to make unhurried judgments regarding inmate welfare, and cases where a higher standard of intent to harm applies because certain unforseen circumstances demand instant judgment). In this case, the Miller County individual defendants acted under circumstances in which actual deliberation was arguably practicable because of Fields's allegations that (1) they had been made aware, based on her previous injuries from the same drunk-tank door, that the door was dangerous, and (2) they were previously informed that the jail was understaffed. *See Hart*, 432 F.3d at 806 (applying the deliberate-indifference standard). We will thus apply that standard here.
>
> To define deliberate indifference in a substantive due process case, the Supreme Court has adopted the subjective standard of criminal recklessness set forth in the Eighth Amendment context. *Moore ex rel. Moore v. Briggs*, 381 F.3d 771, 773 (8th Cir. 2004). Deliberate indifference requires that an official must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hart*, 432 F.3d at 806 (internal quotation marks omitted). And deliberate indifference that shocks the conscience in one environment "may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850, 118 S.Ct. 1708.

*Fields*, 652 F.3d at 891-92.

The parties agree that Defendants in the present case had time to deliberate and that Plaintiffs' task is to show deliberate indifference because Defendants did not need to make any quick decisions that merit applying a higher standard.[8] As stated above, deliberate indifference requires both that the official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official actually draw that inference. *Hart v. City of Little Rock*, 432 F.3d 801, 806 (8th Cir. 2005). Mere negligence and even gross negligence are not actionable as a constitutional violation. *Id.* at 805-06.

---

[8]Both parties have expert witnesses. Plaintiffs move to preclude Defendants' expert, Dr. Hardyman, from testifying that there was no significant risk of serious and immediate harm to Ronald Johnson. (Doc. 42.) The motion will be granted. Improper opinions such as this are stating a legal conclusion. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). Given her experience and training, Dr. Hardyman could have expressed her opinion as to the level of risk of harm to Ronald Johnson, but not couched in the language of the legal test itself, but instead in the language normally used in her profession. These improper legal conclusions would not be admissible at trial, so they will not be taken into account for purposes of ruling on the motion for summary judgment. *See Duluth News–Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) ("In evaluating the evidence at the summary judgment stage, we consider only those responses that are supported by admissible evidence."). For the same reason, the Court will not consider those opinions of Plaintiffs' expert, Jeffrey Schwartz, that state a legal conclusion. (For example, Jeffrey Schwartz opines that Defendants' "repeated policy violations and their failures to maintain acceptable security practices were blatant, shocking and unconscionable.") Schwartz could testify that there were failures to maintain acceptable security practices but he would not be allowed to state an opinion that such failures were "unconscionable," as that is a legal question for the court to determine. Plaintiffs also move to preclude Dr. Hardyman's opinion that Berget and Robert's housing and job assignments were "appropriate," which Dr. Hardyman changed to "not unreasonable" in her deposition. Because there is a close fit between Dr. Hardyman's expertise in the area of evaluating classification systems and data concerning prisoners' propensity to commit assaults and her testimony that Berget and Robert's housing and job assignments were not unreasonable, the Court will consider Dr. Hardyman's opinion, limited to "not unreasonable" as that is how Dr. Hardyman limited that opinion. If Dr. Hardyman continued to believe the housing and job assignments were appropriate, given her training and experience, she could have expressed that opinion. *See, e.g., Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) ("[F]or an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion.").

Plaintiffs contend that, in order to determine whether Defendants acted with deliberate indifference, the Court should look at Defendants' continuing course of conduct beginning in 2004 when Berget was moved into West Hall. Plaintiffs argue that Defendants' policy allowing maximum custody inmates such as Berget and Robert to be housed outside of Jameson, the only maximum security facility in South Dakota, in turn allowed the inmates to have jobs with less supervision than is required of maximum custody inmates, and this created dangerous conditions at the penitentiary which Defendants knew about and failed to rectify over the years, ultimately depriving Ronald Johnson and Plaintiffs of their substantive due process rights. Most of Defendants' conduct about which Plaintiffs complain is far removed from the ultimate harm to Ronald Johnson. In a case like this, where so much time passed between the initial decisions and the ultimate harm, the Court believes that the immediate and proximate harm element of the *Fields* test ties into the analysis of the deliberate indifference element.

The second element of the *Fields* test states that, in order to be actionable, a defendant's conduct must produce a "substantial risk of serious, immediate, and proximate harm." Here, most of Defendants' actions and decisions are too far removed in time to have put Ronald Johnson at a significant risk of immediate and proximate harm. The Eighth Circuit's decision in *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729 (8th Cir. 1993), is instructive on this issue. Holding that a public school had no constitutional duty to protect a mentally retarded student who was raped in school by a student known to be violent and sexually assaultive, the Eighth Circuit in *Dorothy* noted, "In most every circuit court decision imposing § 1983 liability because the State affirmatively created or enhanced a danger, 'the immediate threat of harm has a limited range and duration[.]'" *Dorothy J.*, 7 F.3d at 733 n. 4 (quoting *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993)). The Eighth Circuit concluded that the plaintiff's injury two years after the attacker was enrolled in the school's special program is "too remote a consequence" of the action or inaction of state officials, thus no liability existed under § 1983. *Id.* at 733; *see also Martinez v. California*, 444 U.S. 277, 285 (1980) (decedent's murder by parolee committed five months after parolee's release "is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law").

Also instructive on the immediate and proximate harm element is a Tenth Circuit case, *Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002). In *Ruiz*, a mother enrolled her child in a state-licensed home daycare. The Colorado Department of Human Services was required to perform criminal background checks on day care operators and confirm operators are properly insured. Colorado officials failed to conduct even a cursory investigation which, had they done so, would have uncovered the operators' extensive criminal background involving domestic violence, and that they were uninsured. The child died from abuse by the operator of the daycare. The mother brought a claim under § 1983 asserting that the department's failure to uncover the operators' history of domestic violence and lack of insurance amounted to a constitutional violation under the state created danger theory. *Ruiz*, 299 F.3d at 1178. In ruling that licensing a daycare is not the requisite affirmative conduct necessary to state a claim, and in upholding dismissal of the § 1983 claim, the Tenth Circuit focused on the requirement that defendants' act of licensing the daycare place the child "at substantial risk of serious, immediate, and proximate harm." *Id.* at 1183. The Tenth Circuit reasoned that the threat of harm must be of "limited range and duration," rather than generally applicable to a broader populace. "[T]he improper licensure did not impose an immediate threat of harm. Rather, it presented a threat of an indefinite range and duration." *Id.* Likewise, in the present case, the decisions to house Berget and Robert outside of Jameson in 2004 and 2009, the renewal of those decisions in the following years, and allowing the inmates to work jobs outside of Jameson, presented a threat of an indefinite range and duration, not an immediate and proximate risk of harm.

The Court will consider actions taken or decisions made by Defendants closer in time to Johnson's murder. The last act that could have constituted an immediate and proximate risk of harm was placing Berget in the recycling orderly job on March 18, 2011, a little over three weeks before Berget and Robert murdered Johnson. The recycling orderly job allowed Berget to leave West Hall regularly throughout the day, and triggered his ability to be in the PI building where Johnson was stationed on April 12, 2011. To decide if Defendants were deliberately indifferent in placing Berget in the recycling orderly job, the Court must determine whether Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to correctional

officers, and whether Defendants actually drew that inference, when Berget was given the recycling orderly job.

Defendants certainly were aware of Berget and Robert's criminal and escape histories when they gave Berget the recycling orderly job, and they were aware that Berget and Robert were still housed outside of Jameson. But Berget had worked as an orderly in various positions for many years without creating a known threat of harm to anyone. Even if the Court assumed Defendants were aware of facts from which an inference of a risk of harm could be drawn, Plaintiffs have not advanced sufficient facts supporting a claim that Defendants inferred someone would be harmed if Berget worked as a recycling orderly. Under an exact analysis of the circumstances in this case, Defendants' conduct within the limited time-frame which the Court may consider is not deliberately indifferent and that conduct does not shock the conscience. *See, e.g., Martinez v. Uphoff*, 265 F.3d 1130 (10th Cir. 2001) (the state-created danger theory did not give rise to liability where prison guard was killed by escaping inmates, ruling that under the circumstances of the case "inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard"). Each case regarding injury or death of a prison guard by an inmate is fact specific. The actions of the murderers of Ronald Johnson shock the conscience, but those are not the actions the Court must consider in determining whether the actions and inactions of any of the Defendants shock the conscience.

Because there is insufficient evidence to show a violation of the Due Process Clause of the Constitution, Defendants are entitled to qualified immunity on Plaintiffs' § 1983 claim. Summary judgment will be granted on the § 1983 claim, and the state law claims will be remanded to state court. *See In re Prairie Island Dakota Sioux*, 21 F.3d 302, 304 (8th Cir. 1994) (if case is removed from state court and the federal claim is dismissed, court has discretion to remand the state law claims as an alternative to dismissing without prejudice). Accordingly,

15

IT IS ORDERED:

1. That Plaintiffs' motion to exclude certain opinions of Defendants' Expert Patricia Hardyman, doc. 42, is granted in part and denied in part as set forth in footnote 8;

2. That Defendants' motion to strike the affidavit of Chester Buie and interview of Timothy Henry, doc. 60, is denied;

3. That Plaintiffs' motion to file supplemental materials in opposition to Defendants' motion for summary judgment, doc. 67, is granted to the extent that the Court will consider admissible information that is based on personal knowledge;

4. That Plaintiffs' motion to supplement the record to alleviate Defendants' objection to Timothy Henry's interview, doc. 77, is granted.

5. That Defendants' motion for summary judgment is granted as to Plaintiffs' federal claim brought pursuant to 42 U.S.C. § 1983; and

6. That the state law claims in Plaintiffs' complaint are remanded to state court.

Dated this 15th day of May, 2014.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
DEPUTY